UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

DIANE DELORES COLEMAN,

           **Plaintiff,**

   - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

           **Defendant.**

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|16|15

**OPINION AND ORDER**

**14-cv-2384 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

      Diane Delores Coleman brings this action, pursuant to the Social Security Act (the "Act"),[1] seeking judicial review of the final decision by the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits and Supplemental Social Security Income ("SSI") benefits.  Both parties moved for judgment on the pleadings.

---

[1]    *See* 42 U.S.C. § 405(g).

## II.   BACKGROUND

### A.   Procedural History

Coleman filed an application for DIB benefits on August 27, 2012, and an application for SSI benefits on August 28, 2012,[2] which were denied on December 6, 2012.[3]  The applications alleged that Coleman had been disabled since November 6, 2011, due to bipolar disorder, post-traumatic stress disorder ("PTSD"), trichotillomania, high cholesterol, and hypothyroidism.[4]  She requested a hearing before an Administrative Law Judge ("ALJ"), and ALJ Patrick Kilgannon presided over a hearing on May 14, 2013.[5]  Coleman, who was represented by counsel, and Josiah Pearson, a vocational expert, testified at the hearing.  After the hearing, the record was held open for Coleman to submit further documentation, which was added to the record.  On July 26, 2013, the ALJ issued the decision finding that Coleman is not "under a disability" within the meaning of the Act from November 6, 2011, through the date of the decision.[6]  The ALJ's

---

[2]      *See* Transcript of the Administrative Record ("Tr."), filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g), at 194, 200.

[3]      *See id.* at 101.

[4]      *See id.* at 194, 201.

[5]      *See id.* at 45, 109.

[6]      *See id.* at 39.

decision became the final decision of the Commissioner on January 15, 2014, when the Appeals Council denied Coleman's request for review of the ALJ's decision.[7] On April 4, 2014, Coleman commenced this action by filing a complaint. She then moved for judgment on the pleadings on September 26, 2014. On January 9, 2015, the Commissioner filed an affirmation in opposition to the motion and moved for judgment on the pleadings. The period at issue is from August 27, 2012, the date Coleman filed her DIB application, through July 26, 2013, when the ALJ issued his decision.[8]

### B.   Administrative Record

The administrative record consists of non-medical evidence, medical evidence, and hearing testimony.

### 1.   Non-Medical Evidence

Coleman is a thirty-nine-year-old single woman with no children.[9] She was born on March 22, 1974, and was thirty-seven years old at the onset of her alleged disability.[10] Coleman has some college education but did not obtain her

---

[7]   *See id.* at 5–7, 21.

[8]   *See* 20 C.F.R. §§ 416.330, 416.335, 416.1481.

[9]   *See* Tr. at 50, 194–195.

[10]   *See id.* at 194.

college degree.[11]  Although Coleman previously received disability benefits up until November 6, 2011, such benefits ceased upon a finding of medical improvement.[12]  She currently lives with her mother.[13]

At the ALJ hearing, Coleman gave the following testimony.  She was last employed as an office manager, which involved answering phones, filing, taking care of the kitchen, and working with staff to maintain the office.[14]  She left this job after an incident where her boss "was ranting," which led Coleman to go under a desk and pull out her hair.[15]  Prior to this position, she worked as a document scanner, an office assistant, a temp, and a file clerk.[16]  Her responsibilities included scanning documents, answering phones, and filing.[17]

Coleman recalled being hospitalized for psychological reasons approximately five years ago but has had no psychiatric hospitalizations since

---

[11]    *See id.* at 50.

[12]    *See id.* at 47, 51.

[13]    *See id.* at 51.

[14]    *See id.* at 51–52.

[15]    *Id.* at 52.

[16]    *See id.* at 52–53.

[17]    *See id.* at 53.

2010.[18]  Approximately three years ago, Coleman began a new treatment regimen for her alleged psychological disorders.[19]  She sees her therapist once per week and her psychiatrist once per month.[20]  Coleman also sees an intensive care manager who occasionally makes house calls.[21]  Although she has had setbacks, Coleman stated that her condition has improved since she began treatment.[22]  She reported symptoms of irritability, depression, difficulty concentrating, sleeplessness, and panic attacks.[23]  Coleman also indicated that she has had issues with marijuana and alcohol in the past but that she no longer uses drugs or alcohol because she understands that it makes her prescription medications ineffective.[24]  She testified that sleepiness is a side effect of her current medication regimen.[25]

### 2.    Medical Evidence: Physical Health

#### a.    Treating Physician–Dr. Laura McGarry

---

[18]    *See id.* at 55.  Coleman was hospitalized in 2012 after she was attacked by a boyfriend. *See id.*

[19]    *See id.* at 55.

[20]    *See id.* at 54.

[21]    *See id.* at 54.

[22]    *See id.* at 55.

[23]    *See id.* at 57–59.

[24]    *See id.* at 56.

[25]    *See id.* at 63.

Coleman has been treated by Dr. McGarry from May 2010 to the time of the hearing.[26]  On May 13, 2010, Coleman saw Dr. McGarry for injuries sustained after being punched in the face during a domestic dispute and has seen Dr. McGarry five times thereafter, including one time after the hearing on April 9, 2013.[27]  Dr. McGarry reported that Coleman has a past medical history of obesity, hypothyroidism, hypertriglyceridemia, cigarette smoking, alcohol abuse, and a disorder of the esophagus.[28]  Other diagnoses pertained to mental health impairments and domestic abuse.[29]  Dr. McGarry's records indicate that Coleman is managing her hypothyroidism and hypertriglyceridemia with medication and that her other physical conditions have improved.[30]  Nothing in Dr. McGarry's reports indicates that Coleman has experienced significant limitations due to her physical impairments.

   **b.   Consulting Physician–Dr. Iqbal Teli (November 12, 2012)**

The Division of Disability Determination referred Coleman to Dr.

---

[26]   *See id.* at 554–581.

[27]   *See id.*

[28]   *See id.*

[29]   *See id.*

[30]   *See id.* at 575–579.

Iqbal Teli, who performed an internal medical consultative examination on November 12, 2012.[31]  Dr. Teli diagnosed Coleman with a history of hypothyroidism, for which she is taking medication, and a history of lower back pain and psychological disorder.[32]  Although he described Coleman as obese, Dr. Teli did not indicate any deficits with respect to her general appearance, gait, or station aside from mild restriction for squatting and her inability to walk on her heels.[33]  The doctor noted that Coleman had no difficulty changing or getting on and off the exam table.[34]  Coleman also had no deficits with respect to her skin or lymph nodes, chest or lungs, heart, abdomen, extremities, fine motor activity of her hands, or her musculoskeletal or neurological systems.[35]  Indeed, she demonstrated full range of motion in her cervical and lumbar spine as well as in her shoulders, elbows, forearms, wrists, hips, knees, and ankles.[36]  Coleman also had intact hand and finger dexterity, with full grip strength, and her joints were stable and non-

---

[31]    *See id.* at 539–541.

[32]    *See id.* at 539, 541.

[33]    *See id.* at 540–541.

[34]    *See id.* at 540.

[35]    *See id.* at 540–541.

[36]    *See id.*

tender.[37]  In light of the foregoing, Dr. Teli concluded that Coleman's prognosis was stable.[38]

### 3.    Medical Evidence: Mental Health

#### a.    Treating Medical Professionals

##### I.    Bronx-Lebanon Hospital Center

Coleman has attended regular outpatient therapy sessions with various health professionals at Bronx-Lebanon Hospital Center since 2010.[39]  She was diagnosed with bipolar disorder, trichotillomania, PTSD, cannabis abuse, and alcohol abuse.[40]  On January 5, 2012, Coleman reported that she had recently relapsed in her use of marijuana after being drug free for five weeks.[41]  A mental status evaluation revealed an angry and depressed mood with congruent affect.[42]  Although she appeared less depressed, Coleman was angrier and more anxious than she was in her previous session.[43]  On January 13, 2012, Coleman reported

---

[37]    *See id.* at 541.

[38]    *See id.*

[39]    *See id.* at 412, 601–661.

[40]    *See, e.g.*, *id.* at 412, 604.

[41]    *See id.* at 601.

[42]    *See id.*

[43]    *See id.*

feeling fine and indicated that she was coping well with her daily life activities and stressors.[44]  According to a mental status examination, Coleman was cooperative, attentive, friendly, and pleasant; her thought process was logical and coherent; her concentration, cognition, memory, insight and reasoning were intact; her judgment was mildly impaired and her impulse control was fair.[45]  She was "less anxious" and "doing better."[46]  On January 26, 2012, Coleman reported feeling sad and a mental status examination revealed that she had a depressed mood with distressed affect.[47]

On March 8, 2012, and April 6, 2012, Coleman reported that she was still plucking hair from her scalp.[48]  On April 20, 2012, Coleman reported that she was doing "ok" but that she was using marijuana once per week and had been using alcohol.[49]  At her next appointment on April 24, 2012, Coleman reported "being in an irritable and horrible mood."[50]  On May 4, 2012, she indicated that she

---

[44]    *See id.* at 606–607.

[45]    *See id.*

[46]    *Id.* at 607.

[47]    *See id.* at 609.

[48]    *See id.* at 613, 616.

[49]    *See id.* at 623.

[50]    *Id.* at 625.

was in a good mood, that she was taking her medications as prescribed, that she did not notice any side effects, and that she had been pulling out her hair more frequently.[51]  Later that month, Coleman reported that she was upset and tired, and revealed that she continued to use marijuana and alcohol.[52]  On June 25, 2012, Coleman stated that she continued to pull out her hair and smoke marijuana.[53]

On July 27, 2012, Coleman began seeing Dr. Hammad Mohsin, a psychiatrist.[54]  Coleman was "much better" as her mood and anxiety symptoms were in complete remission.[55]  She met with Dr. Mohsin again on August 22, 2012, after Coleman had been "acting out" by not taking her medication and threatening to break a television.[56]  A mental status examination revealed that she was uncooperative at times and in an angry, irritable mood with congruent affect.[57]  On August 29, 2012, Dr. Mohsin completed a comprehensive treatment plan review and diagnosed Coleman with alcohol dependence, bipolar disorder, and borderline

---

[51]    *See id.* at 627.

[52]    *See id.* at 630–631, 633, 635–637.

[53]    *See id.* at 640.

[54]    *See id.* at 651–653.

[55]    *Id.* at 651.

[56]    *Id.* at 654.

[57]    *See id.*

personality disorder.[58]

Coleman continued seeing various professionals throughout October and November 2012.  During this period, she reported feeling agitated, sad, and anxious; that she was eating bath soap; and that she continued to have the urge to pull out her hair.[59]  On November 13, 2002, Coleman reported that she had stopped drinking alcohol and using marijuana, which she believed made her medications start working better.[60]  On December 7, 2012, Coleman indicated that she was feeling "ok" but irritable on occasion.[61]  She reported that she is able to control her anger and crying, and that her mood and anxiety symptoms are in complete remission.[62]  On January 7, 2013, Coleman indicated that she had been feeling very depressed and was unable to move out of bed.[63]  Dr. Mohsin increased her lithium dose to address Coleman's mood instability.[64]  On February 21, 2012, Coleman

---

[58]     *See id.* at 657.

[59]     *See id.* at 664, 666, 668, 672, 676.

[60]     *See id.* at 672.

[61]     *See id.* at 678.

[62]     *See id.*

[63]     *See id.* at 680.

[64]     *See id.*

reported feeling anxious at times and that she continued to pull out her hair.[65]

Dr. Mohsin completed a Psychiatric/Psychological Impairment Questionnaire dated April 1, 2013.[66]  He diagnosed bipolar disorder, PTSD, and trichotillomania.[67]  He indicated that Coleman's current Global Assessment of Functioning ("GAF") score was 45 and that her lowest GAF score in the past year was 35.[68]  His clinical findings included sleep disturbance, personality change, mood disturbance, emotional lability, anhedonia, psychomotor agitation or retardation, social withdrawal or isolation, decreased energy, generalized persistent anxiety, hostility, and irritability.[69]  Furthermore, Coleman's primary symptoms were depression, anxiety, decreased interest, anhedonia, irritability, and low frustration tolerance.[70]  Dr. Mohsin opined that Coleman was markedly limited in understanding and memory, sustained concentration and persistence, social interactions, and adaptive functioning.[71]  He further determined that Coleman was

---

[65]     *See id.* at 684.

[66]     *See id.* at 545–552.

[67]     *See id.* at 545.

[68]     *See id.*

[69]     *See id.* at 546.

[70]     *See id.* at 547.

[71]     *See id.* at 548–550.

incapable of working even in "low stress" environments due to her combined mood and anxiety symptoms as well as her inability to tolerate minor stressors.[72]  In a letter dated April 15, 2013, Dr. Mohsin opined that Coleman was disabled without consideration of any past or present drug or alcohol use.[73]

### ii.    Montefiore Hospital (March 31, 2012 –April 2, 2012)

On March 31, 2012, Coleman was admitted to Montefiore Hospital after being attacked by her boyfriend.[74]  Dr. Matthew Swain conducted a psychiatric consultation on April 2.[75]  Coleman reported feeling sad, but denied any significant depressive symptoms, manic symptoms, or delusions.[76]  A mental status examination revealed that Coleman was comfortable, calm, alert, slightly disinhibited at times, occasionally tearful, and her mood was sad.[77]  Dr. Swain concluded that Coleman appeared to be "stable from a psychiatric standpoint,

---

[72]    *See id.* at 551.

[73]    *See id.* at 553.

[74]    *See id.* at 322, 335.

[75]    *See id.* at 348.

[76]    *See id.*

[77]    *See id.* at 350.

without evidence of psychiatric decompensation."[78]

### b.    Consulting Physicians and Psychologists

### I.    FEGS (July 31, 2012–August 3, 2012)

A team at the Federation Employment and Guidance Services ("FEGS") conducted a "biopsychosocial evaluation" and diagnosed bipolar disorder, PTSD, and trichotillomania.[79]  Notes indicate that Coleman appeared "cooperative, friendly and calm."[80]  Her responses to questions regarding her affect, energy, and concentration over the prior two weeks indicated that her depression severity was moderate.[81]  Indeed, she indicated that she was depressed more than half of the days during the previous two weeks due to "past life experiences and current stressors."[82]  Coleman reported three suicide attempts (the last of which occurred two to three years earlier) but denied current suicidal ideation, homicidal ideation, and auditory or visual hallucinations.[83]  Coleman also reported that she is compliant with her psychotropic medications and meets with

---

[78]        *Id.*

[79]        *See id.* at 360–411.

[80]        *Id.* at 396.

[81]        *See id.* at 370.

[82]        *Id.* at 393.

[83]        *See id.* at 369, 392.

her therapist twice per month and her psychiatrist once per month.[84]  Sometimes her medications make her feel "groggy" or fatigued.[85]

Although Coleman indicated that she used public transportation to travel to the appointment independently,[86] she indicated that generally she is unable to travel alone.[87]  She also stated that she is able to perform daily activities independently, including household chores, self-grooming, cooking, shopping, and socializing.[88]  She reported, however, that sometimes she has difficulty completing some of these activities due to her mental health condition.[89]  Although a physical examination returned no remarkable results[90] and no physical work limitations were noted other than a need to be in low stress environments,[91] it was determined that Coleman had substantial functional limitations to employment due to her

---

[84]     *See id.* at 370.

[85]     *Id.* at 396.

[86]     *See id.* at 371.

[87]     *See id.* at 393.

[88]     *See id.* at 371.

[89]     *See id.* at 394.

[90]     *See id.* at 401–402.

[91]     *See id.* at 403.

mood disorder that make her unable to work.[92]  Dr. Charles Pastor, a psychiatrist

who evaluated Coleman, opined that Coleman was severely impaired in her ability

to follow work rules and adapt to stressful situations, as well as in the area of

persistence.[93]  Dr. Pastor further determined that Coleman exhibited moderate

functional impairment in her ability to accept supervision, deal with the public,

maintain attention, relate to co-workers, and adapt to change.[94]  He opined that

Coleman was permanently disabled from work for at least one year.[95]

### ii.     Dr. Lucy Kim (June 1, 2013)

On June 1, 2013, Dr. Lucy Kim, a psychologist, conducted a

consultative psychiatric examination of Coleman.[96]  Coleman reported that she was

unemployed and that she had traveled to the appointment with her mother, using

public transportation.[97]  Coleman described persistent depressive symptoms of "sad

moods, crying spells, hopelessness, loss of usual interest, fatigue, worthlessness,

diminished sense of social pleasure, and social withdrawal," as well as panic

---

[92]     *See id.* at 405–407.

[93]     *See id.* at 410.

[94]     *See id.*

[95]     *See id.*

[96]     *See id.* at 687–691.

[97]     *See id.* at 687.

attacks.[98]   Additionally, she reported experiencing "decreased need for sleep, pacing, pressured speech, distraction, and psychomotor agitation."[99]   Coleman also discussed her drug and alcohol history.   She disclosed that she had a history of alcohol abuse and that her last use was nine months ago.[100]   Coleman further reported using marijuana "on-and-off from teenage years to college" and that her last use was one and a half years ago.[101]   A mental status examination revealed that Coleman was very tearful at times; her speech was fluent and clear; her thought process was coherent and goal directed; her mood was dysthmyic; she was able to show full range of appropriate affect; her attention and concentration were mildly impaired; her intellectual functioning was in the below average range; her insight was fair; and her judgment was poor.[102]

Dr. Kim diagnosed Coleman with bipolar disorder, trichotillomania by history, PTSD by history, and borderline personality disorder by history.[103]   Dr. Kim opined that Coleman's prognosis was "poor given her severe bipolar disorder

---

[98]      *Id.* at 688.

[99]      *Id.*

[100]      *See id.*

[101]      *Id.*

[102]      *See id.* at 689–690.

[103]      *See id.* at 691.

symptoms."[104]  Dr. Kim further concluded that Coleman could perform simple tasks independently with supervision, that she is unable to maintain a regular schedule, and that she needs assistance and supervision to perform complex tasks independently and make appropriate decisions.[105]  Dr. Kim also opined that Coleman demonstrated marked limitations in her ability to cope with stress.[106]

### c.     Reviewing Physicians–Dr. M. Apacible (November 29, 2012)

Dr. M. Apacible, a State agency psychiatrist, reviewed the evidence of record on November 29, 2012.[107]  In assessing Coleman's condition, he considered Coleman's medical reports from Dr. Teli and FEGS.[108]  Dr. Apacible determined that Coleman's affective disorders, personality disorders, and substance addiction disorders resulted in mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of extended

---

[104]     *Id.*

[105]     *See id.* at 690.

[106]     *See id.*

[107]     *See id.* at 90.

[108]     *See id.* at 91.

decompensation.[109]  Considering that Coleman's medical records from August

2012 through October 2012 revealed generally benign mental status examinations

with psychotic symptoms in remission, Dr. Apacible concluded that Coleman is

able to perform unskilled, low contact, low stress work and is not disabled.[110]

## C.    The ALJ's Decision and Analysis

The ALJ applied the five-step sequential process, including the

"special technique" applied to mental impairments, to evaluate Coleman's claim.

At step one of his analysis, the ALJ determined that Coleman had not engaged in

substantial gainful activity ("SGA") since November 6, 2011.[111]  Next, at step two,

the ALJ concluded that Coleman's severe impairments were "[h]ypothyroidism;

obesity; bipolar disorder; post-traumatic stress disorder (PTSD) with

trichotillomania; borderline personality disorder; and alcohol dependence, cannabis

abuse, and a history of cocaine-induced mood disorder."[112]  However, the

claimant's hyperlipidemia was not severe because it does not cause "work-related

limitations that would be expected to last for a continuous period of at least 12

---

[109]     *See id.* at 90.

[110]     *See id.* at 93–94, 96.

[111]     *See id.* at 27.

[112]     *Id.* at 28.

months."[113]  Additionally, the claimant's alleged two-year history of back pain was deemed not medically determinable due to an absence of medical signs and laboratory findings supporting the existence of the impairment.[114]  At the third step, the ALJ determined that Coleman "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."[115]  The ALJ also determined that although Coleman has moderate restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace, she experienced no episodes of decompensation on the basis of her mental health impairments.[116]

At step four, the ALJ found that Coleman had the residual functional capacity ("RFC") to perform a reduced range of light work as defined by statute.[117] The ALJ summarized Coleman's testimony at the hearing and the medical evidence in the record and determined that "the claimant's medically determinable

---

[113]    *Id.*

[114]    *See id.*

[115]    *Id.*

[116]    *See id.* at 29.

[117]    *See id.* at 30.  *See also* 20 C.F.R. §§ 416.967(b), 404.1567(b) (defining light work).

impairments could reasonably be expected to cause the alleged symptoms" but that "no source has credibly demonstrated that [Coleman] would be unable to tolerate all work activity on a sustained basis."[118]  The ALJ determined that the evidence of Coleman's physical impairments was too limited to justify a substantial reduction in her ability to perform basic exertional exercises.[119]  The ALJ also found that although Coleman has experienced exacerbated symptoms of depression and anxiety, "she has frequently had normal mental status examinations or has told her treating sources that her symptoms were under control with treatment."[120]  The ALJ relied heavily on the opinions of Dr. Teli, an internist who conducted a physical examination and opined that Coleman had no physical limitations but for a mild restriction for squatting, and Dr. Apacible, the State agency psychiatric consultant who opined, based on Coleman's treating source notes, that Coleman "could perform unskilled, low contact, low stress work."[121]  Furthermore, the ALJ concluded that Coleman's own statements "concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible" due to

---

[118]    Tr. at 33, 37.

[119]    *See id.* at 33.

[120]    *Id.*

[121]    *Id* at 35–36.

inconsistencies with the record.[122]

At the final step of the analysis, the ALJ concluded that although Coleman is unable to perform any past relevant work, her age, education, work experience, and residual function capacity ("RFC") allow her to perform other jobs in the national economy, which "exist in significant numbers."[123]  Because Coleman is a "younger individual" with at least a high school education and is able to communicate in English, and given the RFC finding for a reduced range of light work, the ALJ determined that Coleman "has not been under a disability" since November 6, 2011, and denied her claim for benefits.[124]

## III.   LEGAL STANDARD

### A.   Standard of Review

#### 1.   Substantial Evidence Standard

In reviewing an ALJ's decision, a district court does not conduct a de novo review of the ALJ's decision.[125]  The ALJ must set forth the crucial evidence

---

[122]   *Id.* at 33–34.

[123]   *Id.* at 37.

[124]   *Id.* at 38–39.

[125]   *See Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011).  *See also Brickhouse v. Astrue*, 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

and factors supporting his decision with sufficient specificity,[126] but a district court

must not disturb the ALJ's decision if "correct legal standards were applied" and

"substantial evidence supports the decision."[127]  "Substantial evidence is 'more

than a scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"[128]

      "'To determine whether the findings are supported by substantial

evidence, the reviewing court is required to examine the entire record, including

contradictory evidence and evidence from which conflicting inferences can be

drawn.'"[129]  Even if there is substantial evidence for the claimant's position, the

Commissioner's decision must be affirmed when substantial evidence exists to

---

[126]    *See McCallum v. Commissioner of Soc. Sec.*, 104 F.3d 353 (Table) (2d Cir. 1996); *Ramos v. Barnhart*, No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6, 2003).

[127]    *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  *See also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  *Accord Halloran*, 362 F.3d at 31.

[128]    *Burgess v. Astrue*, 537 F.3d 117, 127-28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S.  389, 401 (1971)).  *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[129]    *Tarsia v. Astrue*, 418 Fed. App'x 16, 17 (2d Cir. 2011) (quoting *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999)).

support it.[130]  Moreover, the Commissioner's findings of fact, as well as the

inferences and conclusions drawn from those findings, are conclusive even in cases

where a reviewing court's independent analysis of the evidence might differ from

the Commissioner's analysis.[131]

### 2.     Full and Fair Hearing

However, the reviewing court must be satisfied "that 'the claimant had

a full and fair hearing under the Secretary's regulations and in accordance with the

beneficent purposes of the Act.'"[132]  In this regard, the ALJ must affirmatively

develop the record in light of the essentially non-adversarial nature of a benefits

proceeding.[133]  "This duty arises from the Commissioner's regulatory

---

[130]     *See Davila-Marrero v. Apfel*, 4 Fed. App'x 45, 46 (2d Cir. 2001)
("'Where there is substantial evidence to support either position, the determination
is one to be made by the factfinder.'") (quoting *Alston v. Sullivan*, 904 F.2d 122,
126 (2d Cir. 1990)).  *See also Morillo v. Apfel*, 150 F. Supp. 2d 540, 545 (S.D.N.Y.
2001).

[131]     *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005).

[132]     *Echevarria v. Secretary of Health and Human Serv.*, 685 F.2d 751,
755 (2d Cir. 1982) (quoting *Gold v. Secretary of Health, Educ., and Welfare*, 463
F.2d 38, 43 (2d Cir. 1972)).  *Accord Jones v. Apfel*, 66 F. Supp. 2d 518, 522
(S.D.N.Y. 1999) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990))
(explaining that the Act must be liberally construed because it is a remedial statute
that is intended to include, rather than exclude, potential recipients of benefits)).

[133]     *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citing *Pratts v.
Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

obligations,"[134] which include developing plaintiff's "complete medical history,"
and making "every reasonable effort" to help the plaintiff get the required medical
reports.[135]  This duty "exists even when . . . the claimant is represented by
counsel."[136]  "Where there are gaps in the administrative record, remand to the
Commissioner for further development of the evidence is appropriate."[137]

### B.   Five-Step Process

#### 1.   Physical Impairment

Pursuant to the Act, the SSA has established a well-known five-step
sequential process to determine whether a claimant is disabled.[138]  At step one, the
ALJ must decide whether the claimant is engaging in SGA.[139]  If the claimant is not
engaging in SGA, the analysis proceeds.  At step two, the ALJ must determine

---

[134]    *Pratts*, 94 F.3d at 37.

[135]    20 C.F.R. § 404.1512(d).

[136]    *Pratts*, 94 F.3d at 37 (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).

[137]    *Jones*, 66 F. Supp. 2d at 524 (citing *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999)).  *Accord Richardson v. Astrue*, No. 09 Civ. 1841, 2009 WL 4793994, at *8 (S.D.N.Y. Dec. 14, 2009) ("If the ALJ's rationale could be rendered more intelligible through further findings or a more complete explanation, remand is appropriate.") (citing *Pratts*, 94 F.3d at 39).

[138]    *See* 20 C.F.R. § 404.1520(a)(4).

[139]    *See id.* § 404.1520(a)(4)(i).

whether the claimant has a "severe" medically determinable impairment or combination of impairments that significantly limits the claimant's ability to perform basic work-related activities.[140]  If the claimant has a severe impairment or combination thereof, the analysis must proceed.  At step three, the ALJ determines whether the claimant's impairment meets the criteria of a listed impairment.[141]  If the impairment is contained in the Listings, the claimant is considered disabled.[142]  If the impairment does not meet the Listings, the analysis continues.  At step four, the ALJ determines the claimant's RFC,[143] which is "the most [claimant] can still do despite [her] limitations" with respect to past relevant work.[144]  The ALJ must consider all of the claimant's impairments, including related symptoms.[145]  Then, the ALJ must determine whether the claimant has the RFC to perform any relevant

---

[140]     *Id*. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1521(b).

[141]     *See id*.  Part 404, subpart P, Appendix 1 (hereinafter the "Listings" or "Listing of Impairments").  The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just SGA.  *See id*. § 404.1525(a).

[142]     *See id*. § 404.1520(d), (a)(4).

[143]     *See id*. § 404.1520(e), 404.1545.

[144]     *Id*. § 404.1545(a)(1).

[145]     *See id*.

work that the claimant has done in the past.[146]  If the claimant is unable to do any past relevant work, the analysis proceeds.[147]  At step five, the ALJ must determine whether the claimant's RFC, age, education and work experience allow her to perform any other work in the national economy.[148]  If so, the claimant is not disabled.  But if she is unable to do other work, the claimant is disabled.

### 2.    "Special Technique" Applied to Mental Impairments

"[T]he Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments."[149]  The regulations require the application of a "special technique" at steps two and three and at each level of the administrative review process.[150]  The ALJ "must first evaluate [claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [claimant has] a medically determinable mental impairment[.]"[151]  If a medically determinable mental impairment is found, the ALJ "must specify the

---

[146]    *See id*. § 404.1520(f).

[147]    *See id*.

[148]    *See id*. § 404.1520(g)(1).

[149]    *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a).

[150]    *Id*.

[151]    20 C.F.R. § 404.1520a(b)(1).

symptoms, signs, and laboratory findings that substantiate the presence of the

impairment [or impairments] and document his findings in accordance with

paragraph (e) of this section."[152]   The ALJ must then "rate the degree of functional

limitation resulting from the impairment(s) in accordance with paragraph (c),"[153]

which specifies four broad functional areas: (1) activities of daily living; (2) social

functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation.[154]   The first three areas are rated on a five-point scale, none, mild,

moderate, marked, and extreme; and the fourth area is rated on a four-point scale,

none, one or two, three, and four or more.[155]   At step two, "if the degree of

limitation in each of the first three areas is rated 'mild' or better, and no episodes

of decompensation are identified, then the reviewing authority generally will

conclude that the claimant's mental impairment is not 'severe' and will deny

benefits."[156]   But if the claimant's mental impairment is deemed severe, the ALJ

---

[152]     *Id*.

[153]     *Id*. § 404.1520a(b)(2).

[154]     *Id*. § 404.1520a(c)(3).  "Episodes of decompensation are
exacerbations or temporary increases in symptoms or signs accompanied by a loss
of adaptive functioning, as manifested by difficulties in performing activities of
daily living, maintaining social relationships, or maintaining concentration,
persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (quotation marks omitted).

[155]     *See* 20 C.F.R. § 404.1520a(c)(4).

[156]     *Kohler*, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(d)(1)).

must determine at step three whether the impairment meets or equals the severity of a mental disorder identified in the Listings.[157]  The ALJ's written decision must reflect application of the technique, including "a specific finding as to the degree of limitation in each of the" four functional areas.[158]  Finally, an analysis under the four broad categories is not a substitute for an RFC determination, which requires a more detailed assessment.[159]

### C.    The "Treating Physician" Rule

Only acceptable medical sources can be relied on to establish the existence of a medically determinable impairment or be considered treating sources whose opinions are entitled to controlling weight under the "treating physician" rule.[160]  Under the "treating physician" rule, "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical

---

[157]    *See* 20 C.F.R. § 404.1520a(d)(2).

[158]    *Id*. § 404.1520a(e)(2).  *See id*. § 416.920a(e)(4) ("The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).").

[159]    *See, e.g., Golden v. Colvin*, No. 12 Civ. 665, 2013 WL 5278743, at *3 (N.D.N.Y. Sept. 18, 2013).

[160]    *See id*. at *2-3.

findings and not inconsistent with other substantial record evidence."[161]  When a

treating physician's opinion is not given controlling weight, the regulations require

the ALJ to consider several factors in determining how much weight it should

receive.  These factors include: (1) the frequency of examination and the length,

nature, and extent of the treatment relationship; (2) the evidence in support of the

opinion; (3) the opinion's consistency with the record as a whole; and (4) whether

the opinion is from a specialist.[162]  After considering the above factors, the ALJ

must "comprehensively set forth his reasons for the weight assigned to a treating

physician's opinion."[163]  Failure to provide "'good reasons for not crediting the

---

[161]  *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. § 416.927(d)(2)).  *Accord* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  "Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health."  *Roman v. Astrue*, No. 10 Civ. 3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (citing *Canales v. Commissioner of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010)).

[162]  *See* 20 C.F.R. § 404.1527(d)(2).

[163]  *Newbury v. Astrue*, 321 Fed. App'x 16, 17 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33).  *See also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion").

opinion of a claimant's treating physician'" is grounds for remand.[164]

### D.    Claimant's Credibility

An ALJ is permitted to consider an individual's activity level in making a determination of credibility.  The ALJ will consider "all of the medical and non-medical information in determining credibility."[165]  Additionally, while "'[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,'"[166] the ALJ "'is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'"[167]  In weighing the credibility of the claimant's testimony, her work history is just one of many factors the ALJ may consider.[168]

---

[164]    *Newbury*, 321 Fed. App'x at 17 (quoting *Snell*, 177 F.3d at 133). *Accord Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reason' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

[165]    20 C.F.R. § 404.1529(c)(3)(I).  *See also Rosado v. Shalala*, 868 F. Supp. 471, 472-73 (E.D.N.Y. 1994) (holding that an ALJ may rely on a claimant's activities of daily living as substantial evidence in support of his determination).

[166]    *Montaldo v. Astrue*, No. 10 Civ. 6163, 2012 WL 893186, at *17 (S.D.N.Y. Mar. 15, 2012) (quoting *Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009)).

[167]    *Id*. (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

[168]    *See id*. (citing *Schaal*, 134 F.3d at 502).

## IV.    DISCUSSION

Coleman contends that ALJ failed to properly weigh the medical opinions in the record and failed to properly evaluate Coleman's credibility.[169] Each of these issues is addressed in turn.

### A.    The ALJ Gave Appropriate Weight to Dr. Mohsin's Opinion

Coleman contends that Dr. Mohsin's opinion should have been given controlling weight.[170]  Typically the opinion of a treating medical professional is not given controlling weight if there are inconsistencies between that opinion and the opinions of other experts.[171]  Here, the ALJ found several inconsistencies between Dr. Mohsin's opinions and the evidence in the record,[172] thereby providing justification for the ALJ's decision not to accord controlling weight to Dr. Mohsin's opinion.  *First*, Dr. Mohsin inaccurately reported that Coleman's GAF score had been as low as 35[173] when nothing in the record indicates that her score

---

[169]     *See* Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), at 11–22.

[170]     *See id.* at 17.

[171]     *See Burgess*, 537 F.3d at 128.

[172]     *See* Tr. at 35.

[173]     *See id.* at 545.

had fallen below 45.[174]  *Second*, Dr. Mohsin indicated that Coleman has required hospitalization or emergency room treatment once per year for her psychological symptoms.[175]  However, as the ALJ noted in his decision, Coleman has required neither hospitalization nor emergency care on the basis of her psychiatric impairments since the alleged onset date.[176]  *Third,* Dr. Mohsin's conclusions[177] are inconsistent with progress notes from Dr. Mohsin's facility, the Bronx-Lebanon Hospital Center, indicating that Coleman was doing well and that her psychiatric symptoms were in remission.[178]

Coleman further contends that the ALJ failed to consider Dr. Mohsin's opinion in light of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927 as required when not giving controlling weight to a treating physician's opinion.  However, the ALJ indicated that he considered Dr. Mohsin's conclusions

---

[174]    *See, e.g.*, *id.* at 410 (indicating a GAF score of 45), 533 (indicating a GAF score of 50), 605 (indicating a GAF score of 61), 636 (indicating a GAF score of 50), 657 (indicating a GAF score of 50), 673 (same).

[175]    *See id.* at 547.

[176]    *See id.* at 547, 55.  During the ALJ hearing, Coleman indicated that she had been hospitalized in 2012 after sustaining physical injuries but had not had any psychological hospitalizations since 2009 or 2010. *See id.* at 55.

[177]    For example, Dr. Mohsin indicated that Coleman's prognosis was "fair" and that she was markedly limited in a number of areas due to her psychiatric symptoms. *See id.* at 545–550.

[178]    *See, e.g.*, *id.* at 606–607, 609, 614, 619, 651, 655, 660, 666, 670, 678.

in light of Dr. Mohsin's specialty as a psychiatrist, the length of his treatment

relationship with Coleman, as well as all of the evidence in the record as a

whole.[179]  Thus, this argument is also without merit.

Because the ALJ applied appropriate legal procedures and provided

good reasons for not fully crediting the opinion of Coleman's treating psychiatrist,

the ALJ did not err in giving Dr. Mohsin's opinion only "some weight."

### B.    The ALJ Gave Appropriate Weight to Dr. Kim's Opinion

Coleman also contends that the ALJ erred by "rejecting" Dr. Kim's

opinion.[180]  To the contrary, the ALJ assigned "some weight" to Dr. Kim's

conclusions but found that some of the information underlying Dr. Kim's opinion,

as well as the opinion itself, was inconsistent with the record.[181]  *First*, because Dr.

Kim was a one-time examiner, she had to rely predominately on Coleman's

statements and affect during the interview to render a conclusion.  As Coleman

provided inaccurate answers to Dr. Kim regarding her alcohol and drug use,[182] Dr.

---

[179]    *See id.* at 35.

[180]    Pl. Mem. at 18.

[181]    *See* Tr. at 36.

[182]    *Compare id.* at 688 (indicating that Coleman told Dr. Kim on June 1, 2013 that she had last used alcohol nine months prior, that she used marijuana on-and-off from teenage years to college, and that her last use of marijuana was a year and a half ago) *with id.* at 654 (indicating that Coleman told her doctor at the Bronx-Lebanon Hospital Center on August 22, 2012 that she last used marijuana

Kim did not diagnose Coleman with an alcohol or cannabis disorder even though those diagnoses are indicated elsewhere in the record.[183]  *Second*, the results of Dr. Kim's mental status examination, which indicated deficits in attention, concentration, and memory,[184] were inconsistent with the examination results of Coleman's treating psychiatric providers, which do not indicate any such deficits.[185]  In light of these inconsistencies, the ALJ's decision to assign only "some weight" to Dr. Kim's opinion does not constitute an error.

### C.    The ALJ Did Not Give Appropriate Weight to Dr. Apacible's Opinion

Coleman further argues that the ALJ erred in assigning "great weight" to Dr. Apacible's opinion because he is a non-examining consultant and, at the time he gave his opinion he had not reviewed the opinions of Dr. Mohsin or Dr. Kim.[186]  The Commissioner contends that State agency medical consultants are highly qualified experts whose opinions may be accorded weight if supported by the medical record and that an incomplete record does not give rise to an error as

---

two weeks earlier) *and id.* at 668 (indicating that Coleman had started drinking again in October 2012).

[183]    *See, e.g.*, *id.* at 616, 648, 654.

[184]    *See id.* at 689.

[185]    *See, e.g.*, *id.* at 531, 664, 668, 676, 684.

[186]    *See* Pl. Mem. at 16–17.

Dr. Apacible was able to review treatment reports from several other sources.[187]  It is true that State agency psychological consultants are considered highly qualified experts whose opinions may be given weight provided that the record supports their findings.[188]  Nevertheless, here it is troubling that the ALJ accorded "great weight" to Dr. Apacible's opinion.  Although Dr. Apacible was able to review Coleman's treatment reports from Bronx-Lebanon Medical Center and Montefiore Hospital, as well as the FEGS evaluations, the record lacked the opinions of treating psychiatrist Dr. Mohsin and consulting psychologist Dr. Kim.[189]  Great weight should not be accorded to the opinion of a non-examining State agency consultant whose opinion is based on an incomplete record that lacks the opinion of the claimant's primary treating psychiatrist.[190]  Though the opinions of Dr. Mohsin or Dr. Kim were not entirely consistent with the rest of the medical evidence in the record, their opinions were not wholly unreliable.  It is possible

---

[187]    *See* Memorandum of Law in Support of Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, at 23.

[188]    *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

[189]    *See* Pl. Mem. at 17; Tr. at 36.

[190]    *See Sweet v. Astrue*, 32 F. Supp. 3d 303, 315 (W.D.N.Y. 2012); *Hall v. Colvin*, 18 F. Supp. 3d 144, 154 (D.R.I. 2014).  *See also Alcantara v. Astrue*, 257 Fed. App'x 333, 334 (1st Cir. 2007) (holding that the ALJ could not give significant weight to a non-examining consultant because the record was significantly incomplete and the opinion was not well justified).

that Dr. Apacible's conclusions may have differed had he reviewed those opinions. Thus, the ALJ's decision to assign "great weight" to Dr. Apacible's opinion constitutes error.

### D.    The ALJ Properly Evaluated Coleman's Credibility

Coleman argues that the ALJ erred in assessing her credibility.[191] Although the ALJ found that Coleman's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ concluded that Coleman's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible."[192]  The ALJ's consideration of the factors outlined in 20 C.F.R. §§ 494.1529(c) and 416.929(c) provide substantial evidence to support this conclusion.  For example, the ALJ considered Coleman's daily activities,[193] which indicate that she can use public transportation, socialize with friends, regularly attend appointments, wash dishes, do laundry, sweep and mop, vacuum, watch television, go to church, make beds, read, shop for groceries, attend large gatherings, and groom herself.[194]  The ALJ also considered the relatively conservative nature of Coleman's treatment regimen,

---

[191]    *See* Pl. Mem. at 19–22.

[192]    Tr. at 33.

[193]    *See* 20 C.F.R. §§ 494.1529(c)(3)(I).

[194]    *See, e.g.*, Tr. at 34, 62, 394, 348, 645.

which includes seeing a therapist once per week and a psychiatrist once per month.[195]  Finally, the ALJ noted inconsistencies in Coleman's statements as further detracting from her credibility.[196]  For example, at the hearing Coleman testified that sleepiness was a side effect of her medication[197] but Dr. Mohsin's report indicates that Coleman did not report any side effects from her medication.[198]  The ALJ also considered Coleman's inconsistent statements regarding her alcohol and marijuana use.[199]  In addition to Coleman's inconsistent statements to Dr. Kim discussed above, Coleman testified at the hearing on May 14, 2013 that she had not used drugs or alcohol for over a year although treatment records document alcohol use in late October 2012 and marijuana abuse in August 2012.[200]

## V.   CONCLUSION

After carefully examining the administrative record, I conclude that the ALJ's decision to assign "great weight" to Dr. Apacible's opinion was

---

[195]   *See id.* at 34, 54, 687.

[196]   *See id.* at 34.

[197]   *See id.* at 63.

[198]   *See id.* at 550.

[199]   *See id.* at 34.

[200]   *See id.* at 56, 654, 668.

improper.  Therefore, the Government's motion is DENIED, Coleman's motion is

GRANTED in part, the Commissioner's decision is vacated, and the matter is

remanded pursuant to sentence four of section 405(g) of Title 42 of the United

States Code for further proceedings consistent with this Opinion.  The Clerk of the

Court is directed to close these motions [Docket Nos. 10 and 15], and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 16, 2015

**–Appearances –**

**For Plaintiff:**

Charles E. Binder, Esq.
Binder and Binder P.C.
60 East 42nd Street, Suite 520
New York, NY 10165
(212) 677-6801

**For Defendant:**

Fergus John Kaiser
Special Assistant United States Attorney
U.S. Social Security Administration
26 Federal Plaza, Room 3904
New York, NY 10278
(212) 264-2049

Susan D. Baird
Assistant U.S. Attorney, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2200